Ellen C. Kynell v. Commissioner. A. F. Kynell v. Commissioner.
Kynell v. Commissioner
Docket Nos. 42552, 42553.
United States Tax Court
T.C. Memo 1954-174; 1954 Tax Ct. Memo LEXIS 69; 13 T.C.M. (CCH) 959; T.C.M. (RIA) 54280; October 18, 1954, Filed *69 Albert Olsen, Esq., 610 Colman Building, Seattle, Wash., for the petitioners. John D. Picco, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings, respondent determined deficiencies in income taxes and penalties as follows: Docket
294(d)
No.
Year
Deficiency
Penalty
42552
1944
$ 4,012.39
1945
1,893.14
$ 93.44
1946
53,584.17
1947
18,976.88
1,792.64
Total
$78,466.58
$1,886.08
42553
1944
$ 4,241.11
1945
1,660.38
$ 102.09
1946
53,892.91
1947
18,934.13
1,770.41
Total
$78,728.53
$1,872.50 One issue has been eliminated by agreement of the parties. The remaining questions are: (1) whether petitioners' two daughters are to be recognized for tax purposes as partners in the Kynell Lumber Company during the years in controversy; (2) whether the income of the Kynell Lumber Company for the fiscal years ended March 31, 1947 and March 31, 1948 should be redetermined on a calendar year basis and partnership distributive shares included in petitioners' income for the calendar years 1946 and 1947; (3) whether petitioners realized taxable income *70 of at least $2,484.93 as a result of the transfer in 1946 of a credit in that amount from the account of J. H. Skalley, allegedly a former partner, to petitioner A. F. Kynell's capital account; (4) whether petitioners should be allowed a deduction for traveling expenses as an ordinary and necessary business expense for the year 1947; (5) the extent to which petitioners realized a long-term capital gain from the sale of their residence in 1946; and (6) depending on the decision of the other issues, the extent, if any, to which petitioners are liable for the penalty for understatement of their estimated tax for the year 1945 under section 294(d)(2) of the Internal Revenue Code of 1939. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner A. F. Kynell, hereinafter sometimes called petitioner, and petitioner Ellen C. Kynell, hereinafter sometimes called petitioner's wife, are residents of Washington, a community property state. They filed separate calendar year income tax returns on an accrual basis for the years in controversy with the collector at Tacoma, Washington. Petitioners were married in 1920. They had three children: Betty, born *71 October 9, 1924; Nancy, born February 28, 1926; and Peter, born in 1931. Petitioner was employed as a millwright in the years before 1929. In 1929, petitioners moved to Enumclaw, Washington, where petitioner became foreman of the White River Lumber Company sawmill. The mill suspended operations in 1932 because of the depression, and petitioners were compelled to move to a farm at Ferndale, near Bellingham, Washington, which belonged to petitioner's wife's mother. Petitioners lived on the farm for 2 1/2 years, during which time they engaged in farming activities and specialized in the buying and selling of chickens. Nancy and Betty were then 8 and 10 years old, respectively. They helped to weigh and package the chickens. In addition, Betty captured the birds and Nancy helped her mother sell them. The chicken business received the full time and attention of petitioners, and its success during this period was dependent on their efforts. Any savings were deposited in a joint bank account in the names of petitioner and his wife. Petitioners returned to Enumclaw in the fall of 1935 and lived for a short time on a farm near town. Nancy picked apples on this farm and sold the resulting *72 cider for enough money to purchase a bicycle. In 1936, petitioners purchased, at a cost of $1,300, a plot of ground near Enumclaw, Washington, on which there was a partially built house. They finished the house with their own and hired labor. Petitioner did practically all the carpentry, and his wife did the lathing work. The family took great pride in their home and all had contributed some labor to its building. The daughters had helped lay the floors. They painted and helped with the lathing of the walls and building of the basement. Nancy and Betty helped after school and during the summer. They were then 10 and 12 years old, respectively. No money earned or belonging to the girls went into the purchase of the home. Petitioner acquired the home with borrowed money and took title in his own name. Petitioner worked at the White River Lumber Company mill from 1935 to May 1943 as superintendent of production and received a salary of $350 per month. Petitioner's wife was employed in 1942 and 1943, first as school teacher, later as mill hand. She received $733.62 in 1942 and $2,897.95 in 1943. The girls were dependent on petitioners for practically all their living and personal expenses *73 during this period. They defrayed a minor part of these expenses in 1942 and 1943 by taking odd jobs during the summer months. Nancy earned $184.82 in 1942 as a soda fountain clerk, and $324.15 in 1943 at the Boeing Aircraft plant in Seattle. Betty earned $80 in 1942 and received wages, the amount of which does not appear, for working at the Enumclaw mill during the summer of 1943. Nancy used her earnings for buying school clothes, paying for tuition, and other personal expenses. Betty also used her earnings for school clothes in 1942 and for uniforms and payment of admission fees of $135 in 1943, and to help out at home. In June of 1943, petitioner's family consisted of himself, his wife, the daughter, Betty, about 19 years of age, the daughter, Nancy about 18 years of age, and the son, Peter, about 12 years of age. For a number of years, petitioner had an ambition to operate his own lumber mill. In 1942 and 1943, he felt that there was no chance for further advancement in his position with his employer. In early 1943, petitioner examined a cedar sawmill near Blaine, Washington, owned by Whatcom Cedar Mills Company, whose past operations had been unsuccessful and which was *74 idle at the time. The owners desired him to undertake the leasing and operation of the mill. Petitioner determined that the principal impediment to efficient operation of the sawmill was improper maintenance and supervision. Petitioner was reasonably certain that successful operations could be achieved by correcting the indicated faults. Petitioner immediately became interested in leasing the mill. In June 1943, The Bellingham National Bank at Bellingham, Washington, indicated a willingness to loan petitioner $10,000 working capital and grant him a credit for purchase of logs up to $25,000, providing he could raise $10,000 from other sources. At that time, petitioner's assets consisted of cash in the amount of about $500; the home at Enumclaw, Washington, estimated to have a value of $15,000, subject to a mortgage of about $4,200; a piece of real property near Ferndale, Washington, from which petitioner and his wife later received $500; a piece of real property at Anacortes, Washington, estimated to have a value of $1,250; some millwright tools valued at $2,100; and household furniture valued at $1,200. The only valuable security that petitioner and his wife could offer was a second *75 mortgage on their home. To place an additional mortgage of $10,000 on the home would involve mortgaging it for its full value. The question of whether they should incur the risk of placing a second mortgage on the home was the subject of extensive discussion between the petitioner, his wife, and his two daughters. He had formerly discussed the idea of operating a mill of his own with his wife. He also discussed the idea with the members of his family, including Peter who was then 12 years of age. They thought it presented an excellent opportunity. They encouraged petitioner to undertake the venture, and assured him that they would stand behind him. Petitioner was able to borrow the additional $10,000 required by the bank from John Mauk, a lumber broker at Seattle, secured by a second mortgage on his home. Arrangements were then completed with the bank, petitioner obtaining $10,000 for working capital and a credit line of $25,000 for the purchase of logs. Petitioner quit his job at the Enumclaw mill as soon as the above negotiations culminated in the execution of a 5-year lease on the Blaine sawmill. He left Enumclaw in May 1943, and began operations in Blaine as a sole proprietorship *76 in June 1943, under the name of Kynell Lumber Company. His family remained in Enumclaw, 130 miles away. Petitioner's wife continued to work at the Enumclaw mill until October 1943, when she joined her husband at Blaine. The rest of the family did not move to Blaine until June 1944. Peter stayed in Enumclaw with petitioner's mother until January 1944, then with Nancy during the spring of 1944 while Nancy was completing her last high school year at Auburn Academy, 15 miles from Enumclaw. Petitioner's family all concurred in the decision to place a mortgage on the home and undertake the mill leasing venture. In June of 1943, the mill was in bad condition and it took a month to get it in operation. Petitioner worked long hours at the beginning and made necessary repairs and improvements, and the mill was soon operating in an efficient manner. Petitioner regarded the future with optimism and expected larger profits in the ensuing years. As early as January 1, 1944, he anticipated that the business would be able to pay out at least $18,000 thereafter in salaries to himself and his wife. During the summer of 1943, petitioner's wife and two daughters would go to Blaine, Washington, 130 *77 miles away, on many week ends and work in the mill on Sunday. In October 1943, petitioner's wife moved to Blaine, Washington, and started working in the mill. The earnings of Kynell Lumber Company for the period from January 1, 1944, to March 31, 1948, were as follows: Year
Amount
1/1/44-12/31/44
$ 56,926.06
1/1/45-6/30/45
30,473.22
7/1/45-3/31/46
104,634.69
4/1/46-3/31/47
144,151.81
4/1/47-3/31/48
124,560.74
On January 1, 1944, petitioners executed an assignment which stated that "in consideration of love and affection" for their daughters, who were respectively about 17 and 19 years old at the time, and for other good and valuable consideration, petitioners were transferring an undivided one-fifth interest in Kynell Lumber Company to each of them. On the same day, petitioners and their two minor daughters executed a partnership agreement which stated that thereafter the business of Kynell Lumber Company would be carried on as a partnership composed of petitioner owning an undivided three-fifths interest and the daughters an undivided one-fifth interest each. Petitioner's wife executed the above documents as the wife of petitioner and member of the marital *78 community, and not as a partner in the business. Profits of the business in 1943 amounted to $5,147.19. In addition, petitioner's wife was paid a salary of $1,500. The books of the business reflected a net worth of $14,365.80 on December 31, 1943. This amount was credited as of January 1, 1944, to the capital accounts of the partnership in the following ratio: 60 per cent to petitioner; 20 per cent each to Betty and Nancy Kynell. By the terms of the partnership agreement petitioner was to be the manager of the business and devote full time to the business and was to receive a salary of $1,000 per month to be charged as an operating expense, and his wife was to be assistant manager at a salary of $500 per month, to be charged as an operating expense. Net profits after deduction of these salaries were to be divided in proportion to the capital interest of the partners. The partnership agreement further provided in part as follows: "7 "In case of dissolution of the partnership by withdrawal, or by mutual consent of the parties, any partner may make a written offer to the other partners to buy the interest of the other partners at a named price, or to sell to the others his *79 own interest at a named price and such other partners shall thereupon within thirty days elect whether they will buy or sell at the named price and if they fail to do so by service of written notice within that time, the partner making such offer may within ten days buy or sell at his own election according to his offer. * * *
"On dissolution of the partnership for any cause, if none of the partners desire to purchase the interest of the others, the business of the partnership shall be wound up and the assets or the proceeds of the sale thereof shall be divided in direct ratio to the interest of each partner. "No partner shall sell his interest in the partnership to any other than the other partners without the consent in writing of such other partners." Petitioner was well qualified by training and long years of experience to operate the mill. He knew the sawmill business thoroughly, especially production and selling. He was indispensable to the business. There was little difference in the operation of the mill after the execution of the partnership agreement. The business would not have been started in 1943 without him. Petitioner had a free hand in the conduct of the *80 business, and he made the final decisions. Petitioner exercised absolute dominion and control over the funds of the partnership. He was the only partner authorized to sign checks, and he alone determined the time business earnings were to be distributed and the amount, if any, to be distributed to the daughters. At no time did petitioner permit his daughters to withdraw their full share of the distributable earnings during the taxable years. Betty and Nancy Kynell never contributed any capital to the business, nor did they pay for the transfer of the $2,873.16 credit from petitioner's account to each of their capital accounts. They had no voice in the management of the business and took no part in its conduct during the taxable years. When petitioner took any important action, he would talk it over with his wife. She in turn would inform the daughters of the action taken. The daughters were too young and inexperienced to exercise independent judgment. They were away most of the time. They knew generally that the business was making profits, but had no idea of the actual figures. They did not know what interest they had in the business in 1948, prior to its dissolution, nor the amount *81 owing to them as their share of the earnings for that year. They could not sign checks, and their withdrawals from the business were within the sole discretion of petitioner. They never at any time received or demanded their full share of the earnings of the business. Betty and Nancy Kynell were minors on January 1, 1944, and attended school until they married, when they moved away from Blaine. Betty attended college in Nebraska in 1943 and nursing school in California during 1944, 1945, 1946 and 1947. She married on August 16, 1947, and thereafter lived in New York until July 1949. Nancy finished her last year of high school in 1944, and attended college in California in 1945 and 1946. She married at the close of her college year in June 1946, and thereafter lived in California until 1949. She raised a family of three children. Throughout the summer vacations of 1944 and 1945, Nancy worked in the mill, loading lumber, running a ripsaw and driving a pickup truck. She was married in 1946, and during the summer vacation of 1947 she and her husband both worked in the sawmill. In February 1945, Betty returned home from California and worked in the office and lumberyard at the mill *82 until October 1945. She also worked at the mill from June 6, 1947, to August 16, 1947. She received no salary for this work except 2 checks, 1 for $108, and 1 for a lesser sum. On the income tax returns of the partnershio for the calendar year 1944, and for the fiscal year ending March 31, 1947, the "time devoted to business" of the two daughters is stated to be "none." Except for occasional discussions at home, or the receipt of letters from their mother on the progress of the business, petitioner's daughters were never actively engaged in the business during the taxable years. They were able to give to the business only such time as they could spare from school or from marriage during these years. On these occasions the services rendered by the girls were mechanical and minor in nature. None of them contributed any vital services. Their participation in the business was entirely passive and did not reflect the interest of partners in the business. Other than amounts drawn to pay their income taxes, withdrawals from the business for the benefit of petitioner's daughters were minor and largely confined to personal and living expenses while attending school. During the years in *83 question petitioner's daughters reported no income other than their distributable share of the earnings of Kynell Lumber Company, as follows: Year
Betty Kynell
Nancy Kynell
1944
$ 8,985.21
$ 8,985.21
1945
4,894.64
4,894.64
1946
19,285.98
19,117.18
1947
28,830.36
28,830.36
1948
22,712.15
22,712.15
Total
$84,708.34
$84,539.54
The drawing accounts of the girls on the books of the business showed withdrawals during the period from January 1, 1944, to March 31, 1948, as follows: Betty
Nancy
Payment
Kynell
Kynell
Cash
$ 7,350.00
$ 8,125.00
Income tax
11,907.00
11,448.67
Insurance
20,305.20
20,276.24
Church
3,240.22
3,240.22
Mt. Baker Savings Ass'n
3,866.32
3,000.00
Ranch & farm equipment
1,696.98
1,671.21
L. L. Sturtz
702.18
702.18
Architect's fees
750.00
750.00
John Mauk
250.00
250.00
Peter Kynell
925.00
925.00
Ellen Kynell
200.00
Unexplained items: "N. W. Clinic"
15.00
"Ashe Motor-Car"
2,072.92
Total payments
$51,207.90
$52,461.44
Approximately 40 per cent of the earnings distributable to the daughters was retained in the business by petitioner. Petitioner's daughters received *84 monthly checks of $125, primarily for the payment of their personal living expenses while at college, which were attributed to cash withdrawals from their drawing accounts. In 1946 and 1947, petitioner took out a large amount of insurance on his life and the cost of this insurance was apportioned among the nominal partners. Petitioner's wife and children, including Peter, were beneficiaries of 1 policy in the amount of $1,000,000. His wife was sole beneficiary of the remaining policies, 1 for $40,000, the other for $5,000. Petitioner canceled the 2 large policies in 1949 for the purpose of paying the debts of Kynell Industries, Inc., a corporation organized by petitioner in 1948 to succeed the partnership. The daughters were kept currently informed of the progress of the business and when available, were consulted in matters relating to major purchases and improvements and other changes. The bank with which the partnership did business was notified of the existence of the partnership. Petitioner and his family belonged to the Seventh Day Adventist Church in Bellingham. Charges were regularly made to the drawing accounts of the daughters for donations to the Bellingham Church. *85 After the daughters married and moved to California and New York, they joined the church in the place of their new residence and contributed to it. However, the charges to their drawing accounts in favor of petitioner's church in Bellingham continued as before. Also charged to their drawing accounts were payments made in connection with the acquisition in 1945 of petitioners' ranch and subsequent improvements thereto. This ranch belonged to petitioner and his wife, and was located 11 miles from Blaine. These charges included architect's fees and payments to L. L. Sturtz and the Mt. Baker Savings Association. Withdrawals were also made in favor of petitioner's wife, Peter, and John Mauk. The payments to John Mauk were in partial satisfaction of petitioner's indebtedness. The earnings of Kynell Lumber Company had climbed to approximately $56,000 in 1944. Market conditions were very favorable in 1945, and petitioner was reasonably assured that his business would continue to prosper in the future. Petitioner was, however, experiencing some difficulty in obtaining logs early in 1945 due to the death of his log buyer. Petitioner had on previous occasions purchased logs through J. H. *86 Skalley, another log buyer. Skalley was then employed as log buyer for another company and did not want to sever his employment with this other company. However, Skalley was willing to help petitioner for 10 per cent of the profits. It was understood that this relationship was temporary and intended to last only so long as necessary to find logging contacts for petitioner which would then continue automatically without Skalley's intervention. Under date of July 2, 1945, petitioner, Betty Kynell, Nancy Kynell and J. H. Skalley executed a certificate of assumed business name stating that they were transacting a partnership business in Whatcom County, Washington, under the firm name and style of Kynell Lumber Company. Petitioner reported Skalley as a partner on the returns and books of Kynell Lumber Company for the period from July 1, 1945, to March 31, 1946. Skalley's account on the partnership records reflected the following: July 31, 1945
Capital, transferred
from petitioner's ac-
count
$ 4,928.53
Mar. 31, 1946
Share of profits
8,330.54
Total credits
$13,259.07
Dec. 31, 1945
Drawing
$5,000.00
Apr. 30, 1946
Drawing
1,243.75
Aug. 31, 1946
Drawing
4,530.89
Total withdrawals
10,774.64
Aug. 31, 1946
Balance transferred
to petitioner's ac-
count
$ 2,484.43
*87 Skalley received regular monthly checks of $500 for his services, except for the last month when he received approximately $4,530.89 in settlement for the entire period. At no time did he ever receive $5,000 or $1,243.75, the amounts shown as drawings on the partnership records. On July 2, 1945, petitioner and Skalley executed an option agreement which provided in part as follows: "WHEREAS the First Party [petitioner] has this day sold to Second Party [Skalley] an undivided 1/10 interest in all assets of the partnership heretofore conducted by First Party, Betty Kynell and Nancy Kynell, under the name of KYNELL LUMBER COMPANY, at the book value of said assets as regularly employed for Income Tax purposes, and "WHEREAS the First Party, the Second Party, and the said Betty Kynell and Nancy Kynell have this day entered into articles of co-partnership for the conduct of a partnership business under the name of KYNELL LUMBER COMPANY, and it is desired to grant to First Party the exclusive option and privilege of repurchasing the interest of Second Party in and to said partnership and the assets thereof, "NOW, THEREFORE, in consideration of the premises and the mutual covenants *88 herein contained and the sale by First Party of an interest in the assets of KYNELL LUMBER COMPANY, as aforesaid, and other good and valuable consideration, the Second Party hereby gives and grants to First Party the exclusive option and privilege of purchasing all interest of Second Party in the partnership business conducted under the name of KYNELL LUMBER COMPANY and in and to all assets thereof, at any time from and after the 30th day of May, 1946, at the book value of said partnership interest and assets as regularly employed by said partnership for Income Tax purposes." There was no consideration for the option agreement of July 2, 1945. Skalley was never told that he had been made the beneficiary of a credit of $4,928.53, the book value of a one-tenth interest by transfer from petitioner's capital account. Skalley had no knowledge of the book transfer, nor did he pay anything for the capital credit. There was no signed partnership agreement with Skalley. A credit balance of $2,484.43 remained on Skalley's account on March 31, 1946, upon termination of his working relationship with petitioner, and this was transferred to petitioner's capital account on August 31, 1946. Skalley *89 was never told that he had a credit balance of $2,484.43. He had no knowledge of the book transfer and never received anything for the credit. When petitioner transferred $4,928.53 from his capital account to J. H. Skalley's capital account, he received no money or other consideration for it. The balance in J. H. Skalley's capital account on August 31, 1946, was transferred back to petitioner in consideration of the original transfer from petitioner to Skalley. Throughout the years 1944 to 1947, the two daughters were each credited with 20 per cent of the net profits of the business after deducting $12,000 a year salary for petitioner and $6,000 a year salary for petitioner's wife. The income of the "partnership," including salary allowances of petitioner and his wife, and the distributable shares thereof for the years 1944 to 1947 according to the tax returns of the "partnership," and the various individuals, was as follows: Distributable
Distributable
Distributable
Total
Share of Earn-
Share of
Share of
Earnings of
ings to A. F.
Earnings of
Earnings of
Period
Partnership
Kynell and
Betty Kynell
Nancy Kynell
Wife
1944
$ 62,926.06
$44,955.64
$ 8,985.21
$ 8,985.21
1/1/45 to 6/30/45
33,473.22
23,683.94
4,894.64
4,894.64
7/1/45 to 3/31/46
* 109,134.69
61,192.94
19,285.98
19,117.18
4/1/46 to 3/31/47
150,151.81
92,491.09
28,830.36
28,830.36
*90 The original and amended returns of Nancy and Betty Kynell for the year 1947 were signed by petitioner's wife as agent. The returns were executed on or about May 14, 1948, and July 28, 1948, respectively. The daughters did not authorize petitioner's wife to sign as agent. The operations of Kynell Lumber Company were so successful and profitable in the ensuing tax years that petitioner began formulating plans for a modern sawmill and for a material expansion which would cost around $1,000,000. In the fall of 1947, petitioner met E. R. Errion who offered to assist him in the promotion of these plans. Errion interested petitioner in a reorganization of his business interests so that petitioner would save taxes and also have ample funds for expanded operations. The general idea was to reorganize Kynell Lumber Company and petitioner's other property into one corporation, and to use the resulting consolidation of assets as a base for the issuance of bonds which could be pledged as collateral for borrowing money to finance petitioner's plans. Petitioner authorized Errion to proceed with the reorganization. *91 Kynell Lumber Company was dissolved in 1948, and all of the business assets, together with other assets owned by petitioner personally, were transferred to a newly formed corporation known as Kynell Industries, Inc. The other assets owned by petitioner and transferred to the corporation included a ranch, shingle mill, retail yard, certain lots in Blaine and 60 acres of land outside Blaine. Kynell Industries, Inc., was organized on March 11, 1948, with an authorized capital stock of 20,000 shares, value $500 per share. Petitioner received title to all the stock excepting 2 qualifying shares issued to petitioner's wife and bookkeeper. Petitioner drew a check for $100,000 in payment for the stock. In addition, petitioner received bonds issued by the corporation having a face value of $1,000,000. Petitioner delivered the bonds in 1948 to Pioneer Trust Company, Salem, Oregon, as collateral for a loan. Later, in 1949, petitioner pledged the stock as collateral for a loan of $10,000. During the first 6 months of 1948, petitioner paid to Errion approximately $70,000. As of February 29, 1948, the partnership had cash, accounts receivable and inventory totaling $282,573.78 and current liabilities *92 of $209,234.05. It was necessary later to shut down the mill and give up the lease. Petitioner now has a suit pending to recover bonds and money from Errion. Petitioner transferred all the assets of the business to Kynell Industries, Inc., without consulting with his daughters or receiving their prior consent or approval They were not living in Blaine at the time. The daughters never received anything from the dissolution of the business, nor any of the stock or bonds of the corporation. They did not comprehend the significance of the dissolution and simultaneous transfer of the assets to Kynell Industries, Inc., and had only the vaguest idea as to what their share in Kynell Lumber Company was worth at date of dissolution or what their share was to be, if any, in the new enterprise. No stock has even been issued or transferred to the daughters, nor have they at any time asked petitioner for stock or bonds of Kynell Industries, Inc. Possession of the bonds had not been obtained as of the time of the trial of this case. Petitioner did not truly intend, in good faith and for business purposes, to join together with his daughters, Betty and Nancy, to carry on business in partnership. *93 Petitioner was the actual person who controlled and operated Kynell Lumber Company. No valid partnership existed between petitioner and his two daughters from January 1, 1944, to February 29, 1948. The income of Kynell Lumber Company was reported on a calendar year basis for the year 1944. It was reported on a fiscal year basis for the short period from January 1, 1945, to June 30, 1945, and for the short period during Skalley's working arrangement from July 1, 1945, to March 31, 1946. Petitioner continued to report the income of the business thereafter on the fiscal year basis. The operations of Kynell Lumber Company were otherwise carried on in the same manner as before. Petitioner and his daughters did not execute a new partnership agreement at this time. Petitioners sold their residence property in Enumclaw for $15,000 in 1946. In their returns for the year 1946, executed on or about May 14, 1947, petitioners reported this property as having a cost of $15,000. This figure was reduced to $7,500 by respondent. On August 14, 1951, petitioner submitted the following statement in support of the cost of the house to the Technical Staff, Internal Revenue Service, Seattle, Washington: *94 "In moving around our papers on cost of home was lost. The house is 34 X 55feet with two floors and basement which makes 2870 square feet per floor, or 5740 square feet in two floors. Oil furnace… Five bedrooms with large closets. Large living room, dining room and kitchen and den. Complete driveway 340feet of concrete sidewalk, retaining wall 7feet high and 30feet long on the bank. The house was not completed before we left so we had to hire the finishing done. The inside of the house was complete, arbors and trellises, upstairs patio 18 feet wide and 34 feet long with canvas roof to floor. The final coat of paint on the whole house. Screened in back porch. At $2.70 per square foot the cost would be $15,498.00. No house of this type could be built at that time for any less. The ground was almost three acres. The house had all oak floors throughout." A house 34 by 55 feet would have 1,870 square feet per floor, or a total of 3,740 square feet, instead of the 5,740 square feet referred to by petitioner. Petitioner's estimate on August 14, 1951, after correction of error in computation, fixed the cost of all the labor necessary to finish the house at $2.70 per square foot or a *95 total cost of $10,098. The total cost of the property was $11,000 and petitioner and his wife realized a capital gain of $4,000 in 1946 upon its sale. Petitioners claimed the amount of $5,800.07 as an ordinary and necessary business expense of Kynell Lumber Company by reason of an extensive trip to Sweden and South America made by them during the latter part of 1946 and early 1947. This deduction was disallowed by respondent. Petitioners made the trip partly for sentimental or pleasure reasons. The parents of petitioner's wife were born in Sweden and petitioners had formerly lived in Venezuela. Petitioner wanted to investigate the possibility of importing merchandise from Sweden. He wanted to study conservation of forests and practical ways of handling waste. He also wanted to study any opportunities for doing business in Rio de Janeiro to explore the possibility of building a sawmill in Venezuela and shipping unfinished material to Blaine for completion. Petitioner was collecting tnformation for use in connection wish possible plans for the future expansion of Blaine Harbor and the future construction of a modern sawmill. The traveling expenses in question had nothing to do with *96 his conduct of mill operations at Blaine at that time. The expense of this trip was an ordinary and necessary business expense to the extent of $750. For the year 1945 petitioner and his wife each reported a net income of $10,704.67 and paid currently, by withholding or pursuant to a declaration of estimated tax, the amounts of $2,982.75 and $3,023.91, respectively. For the preceding year 1944, petitioner and his wife reported a net income of $19,273.42 and $20,223.68, and a tax liability of $7,133.11 and $7,705.26, respectively. The ordinary net income of Kynell Lumber Company for the 12 months ended March 31, 1948, is $145,744.46, exclusive of any deductions for payments made in the calendar year 1948 to E. R. Errion, Bernice Taylor, L. R. McGee and Davenport Corporation, which deductions are not in controversy in this proceeding. The ordinary net income of Kynell Lumber Company for the 9 months' period from April 1, 1947, to December 31, 1947, is $90,000. The expense and revenue accounts of the business for the year ended March 31, 1948, were never closed to profit and loss, or to the capital accounts on the books. Opinion I. We cannot read Commissioner v. Culbertson, 337 U.S. 733, *97 as holding that the mere execution of an agreement purporting to create a family partnership forecloses further inquiry as to the reality of the arrangement. If this were so, a large part of the discussion in that opinion would have been unnecessary and in fact would have to be disregarded. Particularly we must give effect to language which has been so often repeated as to be almost a ritual. Not only the agreement is to be viewed as an operative factor, but also "the conduct of the parties in execution of its provisions, their statements * * * the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used * * *" The conduct of the parties makes it clear that this was an enterprise conceived and directed by the parents, in which the two teen-age daughters had no voice [1] as to policy or proceeds, and in which they took no real interest except as it affected the family fortunes. The "statements" given in evidence, both of petitioner and of the daughters, bear this out. The relationship of the parties was the closest possible and could readily account for what occurred on a purely personal *98 rather than a business basis. Most significant, perhaps, is petitioner's unqualified control of income, as respects both its retention in the business and its use when ostensibly "distributed." There is no evidence that either daughter was ever really consulted as to the one or the other. A small proportion of the "partners'" theoretical income, less than 10 per cent, was actually delivered to them over the entire period. This was so minor that it could have done no more than pay their living and educational costs, items for which petitioner would apparently have been liable in any event. See e.g., Golay v. Golay, 35 Wash. (2d) 122, 210 P. (2d) 1022. As our findings relate in detail, all of the balance was used to improve petitioner's business, to pay for his home, to contribute to his church, to pay income taxes, to cover his life insurance premiums, or to go, for unexplained reasons, to his wife and son. And when the business was wound up, it was he, and *99 not the daughters, who took the entire remaining assets. From beginning to end, the daughters thus received nothing they would not have been equally entitled to had there been no purported "partnership." Certainly it is difficult to conceive of words more apt to describe this result as a mere "paper reallocation" than those of the Culbertson case: "* * * income from the property given to the * * * [daughters] and invested by * * * [them] in the partnership continued to be used in the business or expended for family purposes." If we are to have any regard to the "conduct of the parties" and "the actual control of income" and "the purposes for which it is used" these factors must override the mere formalisms of the written document. But there is more in the Culbertson opinion than this. The daughters made no contribution of original capital, nor vital services, and, as we have said, took no part in the management and control of the business. These are, it is true, the tests generally prescribed in the Lusthaus and Tower cases. [2] But it is in the Culbertson opinion that we find the following language: "Unquestionably a court's determination that the services contributed by a partner *100 are not 'vital' and that he has not participated in 'management and control of the business' or contributed 'original capital' has the effect of placing a heavy burden on the taxpayer to show the bona fide intent of the parties to join together as partners." [Italics added.] This must at least add to and reenforce the usual burden of proof required to rebut the respondent's determination. Such findings are, to be sure, not "conclusive." But they strengthen and buttress the proposition that there was no "real" intent, no "business purpose" for the change in outward semblance of the business form. Finally, we are enjoined by Commissioner v. Culbertson, supra, to distinguish "between active participation in the affairs of the business by a donee of a share in the partnership on the one hand, and his passive acquiescence to the will of the donor on the other." Only the latter phrase can adequately describe the daughters' relationship to the business and financial aspects of this enterprise. We have accordingly made the finding which we think the evidence irresistibly *101 requires that petitioner did not in good faith and acting with a business purpose actually intend to conduct the sawmill business in partnership with his minor daughters. See Giffen v. Commissioner, (C.A. 9) 190 Fed. (2d) 188, certiorari denied 342 U.S. 918. II. As we understand the agreement of the parties, this disposition of the first issue automatically controls the second and requires that income of the Kynell Lumber Company be computed on a calendar year basis. The figures involved appear to be agreed upon and can be taken into account in the recomputation. III. We cannot, however, concur in respondent's further determination, whether or not Skalley ever became a partner, that any income resulted from the handling of his capital account. Petitioner had returned to him less than he originally allocated as Skalley's capital. He was poorer, rather than richer, when Skalley withdrew. Whether we regard the payment to Skalley as salary, or as a distribution of capital and income of a partnership, it seems to be accepted by all concerned that Skalley received all he was entitled to, and, whatever that was, that it came out of petitioner's pocket. No ground *102 for attributing income to him is discernible to us in any of these transactions. IV. While we accept the statement that some amount, perhaps a considerable sum, was expended on material and labor in the construction of petitioner's home, it is also undeniable from his own testimony, that petitioner and his family made large contributions of their own efforts to the project. Petitioner's previous statements themselves, his current financial condition, and the presumption of correctness to which respondent's determination is entitled, make it improbable in the extreme that the property had any greater basis than the $11,000 attributed to it in our findings for the purpose of computing the capital gain on its sale. It may even be that a greater amount has been allocated to basis than the facts warrant. Cf. Cohan v. Commissioner, (C.A. 2) 39 Fed. (2d) 540. On this issue, the deficiency should be recomputed to reflect the increased basis now determined. V. Finally, petitioner claims as a business expense, the costs of trips for himself and wife to Sweden and Venezuela. The absence of corroborating detail as to the actual amounts laid out by each of the petitioners, our *103 doubt in any event that petitioner-wife was required to participate for any business reason, and the admitted motives of personal enjoyment connected with the travel, have led us to our finding as to the limited extent to which these expenses are deductible. See Allan Cunningham, 22 T.C. - (July 15, 1954). The large amounts disbursed, the declared purpose of the travel, and the connection with any ostensible benefit to petitioner's existing business are so disproportionate as to leave us unconvinced that any greater amount was in fact the ordinary and necessary expense which was "directly connected with" or "proximately resulted from" any business in which petitioner was engaged. See Kornhauser v. United States, 276 U.S. 145, 153. Decisions will be entered under Rule 50. Footnotes
*. For this period $9,538.59 of the earnings was attributed to J. H. Skalley.↩
1. Notwithstanding that theoretically they had voting - control. See Armstrong v. Commissioner, (C.A. 10) 143 Fed. (2d) 700. Cf. Losh v. Commissioner, (C.A. 10) 145 Fed. (2d) 456↩.
2. Lusthaus v. Commissioner, 327 U.S. 293. Commissioner v. Tower, 327 U.S. 280↩.